NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

REGINA HUNTER,

          Plaintiff,

  v.

THE ARC OF UNION COUNTY, DAVID B. LASKA, and GERRY HODULIK,

          Defendants.

Civ. Action No. 10-256(KSH)

OPINION

**Katharine S. Hayden, U.S.D.J.**

Plaintiff Regina Hunter, proceeding *pro se,* filed this action against her former employer The Arc of Union County ("the Arc") and two of its employees, David Luska and Gerry Hodulik alleging employment discrimination and retaliation. In April of 2011, Hunter voluntarily dismissed the Arc from her suit but chose to proceed with her claims against Laska and Hodulik. (D.E. 16.) Laska and Hodulik have now filed a motion for summary judgment seeking dismissal of Hunter's remaining claims. Hunter, in turn, sought an extension from the Court to file her own summary judgment motion, which was granted. (D.E. 37.) Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, summary judgment is granted in favor of defendants Laska and Hodulik. Hunter's case is dismissed.

    **I. Background**

New Jersey Local Civil Rule 56.1 requires the moving party on a motion for summary judgment to furnish a statement of material facts not in dispute, and the nonmoving party to

1

furnish "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement." L. Civ. R. 56(1)(a). "[A]ny material fact not disputed shall be deemed undisputed for the purposes of the summary judgment motion." *Id.* Hunter failed to file a 56.1 Statement with her motion for summary judgment, and did not provide a responsive statement to the 56.1 Statement defendants furnished with their motion for summary judgment.

When, as here, a *pro se* litigant fails to comply with Rule 56.1, courts have relaxed the rule and drawn the facts from available sources, including the pleadings and discovery materials. *Jordan v. Allengroup Wheaton,* 218 F. Supp. 2d 643, 646 (D.N.J. 2002), *aff'd* 95 Fed. App'x 462 (3d Cir. 2004); *Folsom v. Superior Ct.,* 2008 U.S. Dist. LEXIS 31994 (D.N.J. Apr. 17, 2008) (using facts drawn from various submissions of *pro se* litigant). Therefore, the below recitation of the facts is drawn from defendants' 56.1 Statement and supporting documentation. Those facts that Hunter disputes through her complaint and discovery materials are deemed denied; all other facts offered by defendants and supported by the evidence are deemed undisputed.

Hunter began her employment at the Arc as a part-time driver on September 5, 2006. (Def's Statement of Undisputed Material Facts ("SUMF"), ¶ 7.) Hunter was responsible for transporting developmentally disabled individuals (referred to as "consumers" by the Arc) to and from their homes to Adult Day Programs ran by the Arc. (*Id.* at ¶ 8.) Hunter was an at-will employee and bound by the employee handbook which stated that disciplinary action could be taken for serious behavioral or performance issues, including termination. (*Id.* at ¶ 9–10.)

During her employment, Hunter received two Corrective Actions related to her behavior. (*Id.* at ¶ 11.) The first was issued on April 1, 2008 due to Hunter's behavior towards another driver while completing her route. (*Id.* at ¶ 12.) Hunter was parked on a one way street,

blocking it from through traffic, while waiting for one of her consumers. (*Id.* at ¶ 14.)  The other driver sought to pass Hunter's van, and Hunter exited the van and yelled at her, "using harsh language." (*Id.* at ¶ 16.)  The driver was so upset by the incident that she filed a police report and wrote a letter to the Arc requesting an apology and demanding that some action be taken. (Decl. of David M. Blackwell, Ex. 7.)  As a result, Hunter received a Corrective Action for her "rude behavior" from Hodulik, her supervisor in the Transportation Department. (Def's SUMF, ¶ 12.)  Hunter believes that Hodulik's actions in requesting that she sign the Corrective Action and apologize to the other driver were discriminatory. (Decl. of David M. Blackwell, Ex. 2, Dep. of Regina Hunter 35:20–39:9.)

On June 26, 2009, Hunter was issued a second Corrective Action for failing to report an accident to the police in a timely manner and refusing to report to the scene of the accident at the request of the police. (Def's SUMF, ¶¶ 21–25.)  Hunter testified that she believed she was being constantly followed by the police and this incident was "set-up" by Hodulik, making his actions discriminatory and retaliatory. (Decl. of David M. Blackwell, Ex. 2, Dep. of Regina Hunter 102:19–103:3.)

Hunter's eventual termination, however, was the result of a meeting with a consumer and his guardian in which Hunter was "openly confrontational." (Def's SUMF, ¶ 32.)  On June 29, 2009 and Individual Habilitation Plan ("IHP") meeting was held to discuss the behavior of one of the consumers that Hunter transported. (*Id.* at ¶ 32–33.)  The meeting was attended by an Arc Behavioral Specialist, a representative of New Jersey's Division of Developmental Disabilities (NJDDD), the consumer, his guardian, and Hunter.  (*Id.* at ¶¶ 32–34.)  At the meeting Hunter explained the consumer's behavior that she believed was inappropriate and asked that he be removed from her van. (Decl. of David M. Blackwell, Ex. 2, Dep. of Regina Hunter 179:11–

3

180:5.) The consumer's guardian became very upset by the things Hunter was saying. (*Id.* 180:6–182:2.) The confrontation between the guardian and Hunter made the consumer upset and he began to cry. (Def's SUMF, ¶ 39.) Hunter was asked to leave the meeting by the NJDDD representative and she initially refused to go. (*Id.* at ¶ 41–43.) Finally upon leaving, Hunter attempted to take information about the consumer that was distributed at the meeting with her. (*Id.* at ¶ 43.) She was told it was confidential information that had to remain in the room, but she refused to relinquish it despite repeated requests from Hodulik. (*Id.* at ¶ 43–44.) Eventually she relented and left. (*Id.* at ¶ 44.) As a result of her behavior during this incident, Hunter was suspended with pay while the Arc investigated the matter. (*Id.* at ¶ 45.)

Due to Hunter's behavior at the meeting and in furtherance of the investigation, the consumer's guardian wrote a letter to the Arc requesting a new driver, prohibiting the consumer from ever being in Hunter's company, and expressing her general unhappiness with Hunter's behavior. (Decl. of David M. Blackwell, Ex. 19.) In the letter the guardian noted that:

> . . . I have gotten many telephone calls from [Hunter] where she complained about Sheila and clients on her van "planning something" or "talking behind my back". It also seems that everyone is out to get her for some reason, as she continues to complain about other people's faults with regard to her having accidents with the van and her neighborhood.

(*Id.*)

On July 6, 2009, at the conclusion of the investigation, Laska, the Human Resources Director, sent Hunter a termination notice which stated she was terminated because her behavior was inappropriate and contrary to the Arc mission statement, to "empower and to support people with disabilities and their families." (Def's SUMF, ¶ 49.) After receiving a Right to Sue letter from the EEOC, Hunter, proceeding *pro se*, timely filed a complaint alleging discrimination and retaliation on the part of the Arc, Hodulik, and Laska. The complaint did not explain how or why

4

Hunter believed she was discriminated against; importantly, it did not indicate what protected characteristic was the basis of her claim. (Compl. ¶ 10.) In her answers to interrogatories, Hunter stated that she was seeking $50,000 in compensatory damages for lost wages, medical bills and emotional distress, but in her deposition she noted that she is now seeking $75,000 because of the damage she has suffered during the course of this litigation. (Def's SUMF, ¶¶ 66–67.) Hunter voluntarily dismissed the Arc from her suit on April 29, 2011, but chose to proceed with her suit against Laska and Hodulik. (D.E. 16.)

Laska and Hodulik filed a motion for summary judgment, to which Hunter responded with multiple submissions. After Hunter submitted material in response to defendants' motion in violation of the motion schedule, the Court granted her an extension to file her own summary judgment motion. (D.E. 37, 39.) Hunter then resubmitted all the documents she had previously filed under the guise of her own motion, though in the later papers she did not request summary judgment in her favor, but rather that the case proceed to trial. (D.E. 41.) In an abundance of caution, defendants filed an opposition. (D.E. 42.) The Court addresses the pleadings as cross-motions for summary judgment.

**II. Standard of Review**

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is genuine if a reasonable jury could find in favor of the nonmoving party and it is material only if it bears on an

essential element of the plaintiff's claim. *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 (3d Cir. 2002).

When deciding a summary judgment motion, a court must "'view the record and draw inferences in a light most favorable to the non-moving party.'" *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) (quoting *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir. 2002)). However, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings" but rather, must set forth actual evidence to demonstrate a genuine issue exists. *United States v. 717 S. Woodward St.,* 2 F.3d 529, 533 (3d Cir. 1993) (internal quotations omitted). "[A]n inference based upon a speculation or conjecture [will] not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The "standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir. 1987).

In the employment discrimination and retaliation context, the *McDonnell Douglass* burden-shifting framework applies to determine whether a claim will survive summary judgment. *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). *See also Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (applying *McDonnell Douglass* to a retaliation claim). First, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglass*, 411 U.S. at 801–02. If successful, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 802. Importantly, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the

6

plaintiff." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant articulates a reason for its actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 254.

### III. Analysis

#### A. *Hunter's Claims under Title VII and the NJLAD Fail as a Matter of Law*

In evaluating Hunter's complaint and deposition, it appears that she brings claims of discrimination and retaliation under both Title VII and the New Jersey Law Against Discrimination (NJLAD). These claims fail as a matter of law because an individual employee cannot be held personally liable for his or her own conduct under either Title VII or the NJLAD. The statutes require that the actual employer be sued.

In pertinent part, Title VII states:

It shall be an unlawful employment practice for an ***employer***

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a) (emphasis added). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." *Id.* § 2000e(b). In *Sheridan v. E.I. DuPont*, 100 F.3d 1061, 1077–78 (3d Cir. 1996), the Third Circuit joined the majority of other circuits in concluding that "Congress did not intend to hold individual employees liable under Title VII" as employers. "It is [now] beyond dispute in this Circuit that individual employees cannot be held liable under Title VII." *Newsome v. Admin. Office of Courts of N.J.*, 103 F. Supp. 2d 807, 816 (D.N.J. 2000) (Greenaway, J.) (citing *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996)).

Hunter voluntarily dismissed the Arc from her suit and only continues with claims against individual defendants Laska, the former Arc Human Resources Director, and Hodulik, the Arc Transportation Department supervisor. These individual employees cannot be held liable under Title VII. Therefore, all of Hunter's claims under Title VII fail as a matter of law and must be dismissed.

Having dismissed the Federal claims of original jurisdiction, this Court may decline jurisdiction over Hunter's state law claims. *See generally,* 28 U.S.C. § 1367. In this instance, however, the Court will exercise its supplemental jurisdiction over the NJLAD claims because the legal analysis applicable to both is essentially the same.

The NJLAD mirrors Title VII and prohibits unlawful employment practices and discrimination by an employer. N.J.S.A. § 10:5-12a. The NJLAD is interpreted analogously to Title VII and does not impose liability on individuals as 'employers.' *Newsome*, 103 F. Supp. 2d at 823 (citing *Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 125 (3d Cir. 1999), *cert. denied* 528 U.S. 1074, (2000)); *Tarr v. Ciasulli*, 181 N.J. 70, 82 (2004) (noting that under a plain reading of the NJLAD "an individual supervisor is not defined as an 'employer'"). While the NJLAD does permit a supervisory employee to be held personally liable if he aids, abets, incites, compels or coerces the harassment of another, one cannot aid and abet his own conduct. *Newsome*, 103 F. Supp. 2d at 823. *See also Hurley*, 174 F.3d at 129; *Tarr*, 181 N.J. at 84.

The New Jersey Supreme Court has held that in order to hold a defendant employee liable as an aider or abettor, the plaintiff must show that, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Tarr*,

8

181 N.J. at 84 (citing *Hurley*, 174 F.3d at 127). Hunter has not pleaded any facts or come forth with any evidence that Laska or Hodulik aided and abetted in unlawful discriminatory conduct predicated against her. She alleges only that Hodulik is responsible for the Corrective Action reports and that Laska was responsible for her termination. And, even if there were more, neither Laska nor Hodulik can be held liable under the NJLAD as aiders or abettors in their own conduct. Therefore, all NJLAD claims against Laska and Hodulik also fail as a matter of law and must be dismissed.

       *B.  Hunter Has Failed to Make a Prima Facie Case of Discrimination or Retaliation*

Hunter's suit must be dismissed because the claims against Laska and Hodulik as individual employees are impermissible under the law. However, even had Hunter not chosen to dismiss her employer, the Arc, she has not provided evidence sufficient to demonstrate a prima facie showing of discrimination or retaliation that can survive summary judgment.[1]

The first step in the *McDonald Douglass* burden-shifting analysis requires the plaintiff to demonstrate a prima facie case of discrimination by producing "evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case." *Pineda v. Bath Unlimited, Inc.,* No. 06-cv-2328, 2007 WL 2705150, at *1 (D.N.J. Sep. 14, 2007). The elements of a prima facie case of discrimination are as follows: (1) that plaintiff is a member of a protected class; (2) that plaintiff was qualified for the position she held; (3) that plaintiff suffered an adverse employment action; and (4) the adverse employment action occured "under circumstances that give rise to an inference of unlawful discrimination." *Jones v. Schl. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

---

[1] Because Hunter is proceeding *pro se*, and the circumstances surrounding her choice to voluntarily dismiss the Arc from her suit are unclear, the Court will address Hunter's claims substantively.

9

Here, it is undisputed that Hunter is African American and no one has argued that she was unqualified for the position she held, therefore the first two elements are satisfied. Similarly, it is undisputed that Hunter was terminated from her position at the Arc, which constitutes an adverse employment action, and, therefore the third element is satisfied. However, viewing the facts in the light most favorable to Hunter, she has failed to demonstrate that the circumstances surrounding her termination give rise to an inference that she was discriminated against. In her complaint, Hunter alleged discrimination in a conclusory fashion—merely writing "discrimination" as a ground for her suit—but failed to signify what protected class was the basis of her discrimination claim. (Compl. ¶10.) At her deposition, when asked on which grounds she believed she was discriminated against, Hunter responded, "I believe there's a lot of racism in this world today, period." (Decl. of David M. Blackwell, Ex. 2, Deposition of Regina Hunter 20:20–21:1.) When specifically asked if she believed she had been discriminated against based upon her race, color, or sex, she responded "Yes" to each question. (*Id.* at 20:7–13.) Hunter, however, refused to describe any particular incident that was predicated by racial discrimination. This exchange during the deposition demonstrates her unwillingness and inability to identify racially discriminatory conduct of the Arc or Arc employees Laska and Hodulik.

> Q: I want you to tell me every incident in which you believe you were discriminated against based upon your race.
> A: Just being black, period.
> Q: Okay. Well, tell me how he discriminated on you based upon your race?
> A: Just being black I am discriminated against. Not many other people – just being black, my color is against me, period. Okay.
> Q. Okay. But what, specifically, did any individual at The Arc or The Arc itself do that you believed was discriminatory based upon your race?
> A: Based upon my race, just being my color, that right there is automatic. I can't say anything else. That's a fact. Okay.
> Q: Well, no. What I am asking you is, what do you believe that the defendants did wrong.
> A: Okay. I can't say because of my color. I already said that. It's no explanation for that. That's a fact. Okay. My color hinders me. Not just me, all

>blacks. We all know that. Okay. I don't want to get into that. That's just something that has been around for God knows how many years and it still is. So, that right there. Okay.

(*Id.* at 22:17–23:16.) Throughout the course of her deposition testimony, Hunter describes disagreements with Hodulik, the incidents that resulted in the two Corrective Actions, and the IHP meeting that ultimately resulted in her termination, but never does she allege that these incidents were motivated by racial animus as is necessary to make a prima facie case of discrimination. A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994).

Moreover, even if Hunter had put forth evidence of discriminatory conduct sufficient to shift the burden of production to defendants, the defendants have demonstrated that there was a perfectly reasonably, non-discriminatory reason for her termination. *See McDonnell Douglass*, 411 U.S. at 802. Defendants state that Hunter's termination was the result of her unprofessional and confrontational conduct with an Arc consumer and the consumer's guardian at an IHP meeting, which culminated in the consumer crying and his guardian demanding that Hunter never come in contact with him again. (Def's Br. 6.) The termination letter explained that Hunter's conduct was contrary to the mission statement of the Arc. (Decl. of David M. Blackwell, Ex. 13.) Hunter has not refuted this rationale in her opposition to defendants' motion or in her moving papers for summary judgment. Nor has Hunter demonstrated that it was pretext for discrimination. She has not shown "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the stated reasons for her termination. *Fuentes*, 32 F.3d at 765. She has presented no evidence to suggest her termination was discriminatory at all; she

merely claims it was wrong. This does not rise to the level of a cognizable claim for discrimination.

Similarly, Hunter has failed to make out a prima facie case for retaliation under Title VII or the NJLAD. "To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir. 2000); *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997); *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989)). *See also* N.J.S.A. § 10:5-12(d). An employee engages in protected activity when she (1) opposes an unlawful employment practice, (2) files a discrimination charge, or (3) participates in a charge brought by another. *See* 42 U.S.C. § 2000e-3a; N.J.S.A. § 10:5-12(d).

Hunter failed to allege that she engaged in any protected activity in her complaint, nor did she provide facts to suggest that the Arc took adverse employment actions. In attempting to understand the basis of Hunter's retaliation claim, defendants point to various incidents that Hunter described in her deposition which she referred to as retaliatory. First, Hunter's claim that she was retaliated against because she had to work over her allotted hours to drop her van aide off at home at the end of her shift has no merit. (Decl. of David M. Blackwell, Ex. 2, 32:22–34:12.) Hunter complained about this practice to Hodulik but that complaint would not rise to the level of protective activity, and as she herself states, the matter was investigated and the procedure changed to reduce her complained of additional driving time. (*Id.* at 34:11–12.)

Therefore, there was no adverse employment action taken, but in fact a positive change made to accommodate Hunter.

Second, Hunter's argument that she was retaliated against because Hodulik told her to pay for traffic tickets she received and that the Arc would reimburse her is also without merit and illogical. (*Id.* at 41:24–44:15.)  It is unclear what protected activity she could have been engaging in and it appears she chose not to pay the traffic tickets, but instead fought them in court and never did have to pay. (*Id.* 44:1–4.)

Third, Hunter claims she was retaliated against because in 2007, she reported to the Arc that one of her consumers told her she had been hit by another Arc employee. (*Id.* 24:23–26:21.) While reporting such an incident could arguably be deemed protective activity, Hunter has not demonstrated that it resulted in any employment action adverse to her. First, the incident occurred in 2007 and Hunter remained employed by the Arc until 2009; thus in cannot be argued that her termination was predicated on this report. (*See id.* 27:23–28:12.) Second, Hunter admits the claim was investigated, she was interviewed by two people, and it was concluded that this particular consumer had a tendency to make such baseless claims. (*id.* 27:2–11; Ex. 23.) Hunter does not suggest any other actions were taken after the investigation that were adverse to her.

Finally, on one occasion Hunter filed assault charges against another Arc employee. (Decl. of David M. Blackwell, Ex. 2, 45:18–48:1.)  The incident occurred because Hunter had been waiting outside for the afternoon pick-up of one of her consumers. (*Id.*) After waiting for a considerable amount of time, Hunter became frustrated, left the bus and attempted to enter the building to retrieve her consumer. (*Id.*)  She claims another Arc employee grabbed her by the arm as she tried to enter the building.  (*Id.*) Hunter filed charges with the local police department. (*Id.*)  After a court appearance, the judge dismissed the charges. (*Id.*)  Again, viewing the facts in

the light most favorable to Hunter, even if the filing of the assault charges could be viewed as a protected activity, she has failed to demonstrate that there was any adverse employment action taken in response.  She says only that Hodulik "had a good rapport" with the other employee, who happened to also be an African American woman, and she could see his "disposition changing towards" her.  (*Id.* at 47:23–48:23.)

The Court has expansively reviewed the record and concludes that Hunter has failed to allege or substantiate any facts upon which a claim for employment discrimination or retaliation can be brought. [2]  Hunter provides no evidence to suggest that her termination was predicated by discrimination related to her race, color, or sex. Moreover, the disagreements she had with her employer and other employees plainly do not constitute or reflect retaliation on the part of the Arc or its employees.

## IV.  Conclusion

Hunter has alleged discrimination and retaliation on the part of two employees of her former employer, the Arc.  As a matter of law, individual employees cannot be held liable under Title VII or the NJLAD; therefore, Hunter's case must be dismissed.  But beyond the legal impediment to Hunter's current lawsuit, her factual allegations are insufficient to demonstrate a prima facie case of discrimination or retaliation under applicable Federal or state law.  Hunter's motion for summary judgment is denied.  Defendants' motion for summary judgment is granted, and Hunter's case is dismissed with prejudice.  An appropriate order will be entered.

    January 9th, 2012                                    /s/ Katharine S. Hayden
                                                                       Katharine S. Hayden, U.S.D.J.

---

[2] Despite her criticisms of her employer, Hunter testified that she received incremental raises during her time at Arc; had never been demoted from her position as a driver; and took on the additional responsibilities of an aide. (Decl. of David M. Blackwell, Ex. 2, 49:3–12; 50:1–19.)